ALLEN, Judge.
Levon Clark, the defendant below and appellant here, sometimes known as “Cigar,” appeals from a verdict of the jury and sentence of the court on a second degree murder charge and from a denial of a motion for a new trial.
Levon Clark, Robert Collins and Gussie Mae Williams, who was the common law wife of the deceased, James Williams, were jointly charged in a grand jury indictment alleging that they, with force and arms at Palm Beach County unlawfully and from a premeditated design, did kill and murder James Williams in said county by drowning him.
Robert Collins was found guilty of murder in the first degree, and Gussie Mae Williams and Levon Clark were found guilty of murder in the second degree.
Gussie Mae Williams, Robert Collins and Levon Clark, the appellant, together with several other persons, drove from West Palm Beach to the Blue Heron Bar in Riviera Beach, an adjoining town in Palm Beach County. They went into the Bar, played the juke box and had several drinks. About 3 :00 P.M. of that same day, Gussie Mae Williams advised the parties that she had to go back to West Palm Beach to pick up her husband, James Williams. James Williams worked for the City of West Palm Beach and he got off from work about 3 :30 P.M.
Gussie Mae Williams owned and operated the car in which the parties were riding. Upon returning to West Palm Beach, everyone got out of her car, except Levon Clark, at 3rd Street and Douglas, to visit some more friends. Before going to the husband’s place of work, Gussie Mae and Levon stopped by her home to see whether her husband had already arrived from work, and found he was at home, together with her landlady.
Gussie Mae Williams, James Williams, her husoand, and the appellant, Levon Clark, sat in the living room and had a drink of whiskey. Thereafter Gussie Mae and her husband had an argument. Later the three of them left in Gussie Mae’s car, went by the Florida Bar and from there to the Blue Heron in Riviera Beach, where they had several drinks in the car. Gussie Mae was still driving, her husband in the middle, and the appellant, Levon Clark, on the outside. Gussie Mae parked the car in the parking lot behind the Ebony Bar in West Palm Beach and they talked awhile. Thereafter the three of them decided to go to the Florida Bar which is located near 2nd Street and Rosemary Avenue in West Palm Beach. On their way they saw Robert Collins and when they called to him he got in the car with them. They parked in front of the Florida Bar a few minutes and then went back behind the Ebony Bar on the parking lot near Rinker Material Company.
They all started drinking again and Gussie Mae and James Williams got into an argument. Gussie Mae punched James in the fact with her fist and slapped him a couple of times. His nose started bleeding. Gussie Mae got out of the car and got a handkerchief to wipe his nose. Robert Collins, also known as Bobby Collins, was sitting in the back seat of the car with James Williams. Collins said, “Let me get out of here before this son of a bitch misses and hits me.” There were words *355 between Collins and James Williams, a few punches were thrown at each other and Collins began walking off, then came back. Gussie Mae decided to drive to Loxa-hatchee. After some distance, Robert Collins asked her where she was going and she said, “I am riding down to Loxahatchee.” Collins decided that he did not want to go to Loxahatchee and wanted to turn back. Gussie Mae stopped and turned around near the canal on 12th Street, at which point they decided to stop and drink some more.
Robert Collins and Levon Clark got out of the car and left Gussie Mae and James Williams in the car. The Williams couple began to argue again. Robert Collins went back to the car and said, “Why don’t you all quit arguing?” James Williams asked Collins what he had to do with it and several threatening remarks followed. James Williams started to get out of the car, Robert Collins grabbed him by the collar, pulled him out of the car and they started fighting. James Williams ended up in the water of the canal and died from drowning.
Fannie Mae Bell, a witness, testified that she rented rooms in her house to James and Gussie Mae Williams. She testified that “Cigar” (Levon Clark) was with Gussie Mae and her husband at her house and that the Williams couple were arguing. She further testified that when she started to go to the kitchen she didn’t know whether Gussie Mae was high or mad, but that Gus-sie Mae did tell James Williams that she would get rid of him one way or the other. She said she did not hear “Cigar” say anything.
. Clayton Leon Johnson, another witness, testified:
“Q. Do you remember the day that the body was found out there, the man’s body was at Twelfth Street?
“A. Yes, I remember when it was found Friday morning.
‘Q. That evening before or that morning before did you see Levon Clark?
“A. Yes.
“Q. And Robert Collins?
“A. Yes.
* * *
Where did you see him and about what time did you see him ? d
The evening before what? >
Before the body was found out in the canal. <d
A. Well, that morning the body was found in the canal, I didn’t see him — period.
“Q. That morning?
“A. I say I saw Robert Collins.
"Q. As a matter of fact, you went out to the canal with Robert Collins ?
“A. Yes, that night.
Q. Now, how long before that had you seen him, Levon Clark and Robert Collins?
“A. We were together most of the evening all evening.
“Q. What time did you first see him?
“A. When I first saw him that evening, I would say about 1:00 o’clock when we were together at the Florida Bar playing whist.
“Q. What, if anything, did they say to you?
“A. They didn’t say anything to me.
“Q. Did they have any talk about what had happened that evening?
“A. No, they didn’t, not to me.
“Q. What was the occasion of your calling Officer McPhail?
“A. When I called Officer McPhail, when they came back that night, *356 Robert Collins and Levon Clark started fighting. Levon Clark called me over after the fight and told me — ”
(Interruptions in testimony by objections of attorneys of various defendants.)
After more testimony was taken during the absence of the jury, the jury was brought back in and Clayton Leon Johnson, further testifying for the State, said:
“BY MR. O’CONNELL: I believe the last question I asked you was whether you had talked to Levon Clark, who I believe you said you called Cigar?
“A. That’s right.
“Q. On the night before you took Officer McPhail down to the Twelfth Street Bridge ?
“A. Yes.
“Q. You said yes. Now, tell us where he talked to you and what he said.
“A. The night before I took McPhail down, he was sitting at Second and Rosemary at the Florida Bar.
“Q. Now, go ahead.
“A. So after that night, that was, that evening was on the third evening. It was on the third evening we talked to Levon Clark and Robert Collins, we had a couple of drinks and we played whist. So they left me.
“Q. Did they come back?
“A. Yes, they came back.
“Q. How long afterwards did they come back?
“A. Well, they came back about, I would say 9:00 o’clock that night.
“Q. What happened when they came back ?
“A. Well, okay, we went off, me, Sarah were driving on First Street and Robert Collins and Cigar, Levon Clark, so him and Bobby got to fighting.
“Q. When you say Bobby, Bobby who?
“A. Robert Collins.
“Q. They had a fight?
“A. Yes.
“Q. Where was that?
“A. On First Street.
“Q. First and Rosemary?
“A. And then I stopped the fight and Levon Clark called me off and told me, ‘You don’t know what happened.’ He said, T done enough tonight to get the electric chair.’ I said, ‘What do you mean?’ He said, T killed a man.’ I said, ‘Killed who?* And he said, T killed Gussie’s old man.’ He said, T didn’t kill him, Bobby killed him, Robert Collins.’ So we walks on down, going down.
“Q. He said a little more than that, didn’t he?
“ * * *
“Q. What else did he say? I will ask that question, what else did he say?
“A. Okay, we were going down, he said, ‘Bobby held his head under water better than IS minutes.’
“Q. Then what did you do ?
“A. I couldn’t believe it then. I called Bobby and asked him, Robert Collins, which he was crying, he said, T didn’t do it, Cigar did it.’ I said, ‘If you didn’t do it, call the police.’ So he picked up the *357 pilone and called the police and then Levon Clark caught him by the hand, he said, ‘You know what you are doing?’ And he told me to call him. So I called the police. After I called the police Levon Clark called Sarah across the street and told her about it, and she fainted. He was going to the Embers Club to get some water, he was to put some water on her face. By that time McPhail came up.
“Q. Now, when Officer McPhail, that is the large officer?
“A. Yes, he came up.
“Q. Do you know Gussie Mae Williams ?
"A. I know — ■
“Q. When I asked you the question you said you didn’t know her.
“A. I know of her, not knowing her personally.
“Q. Do you know her when you see her?
“A. Yes, sir.
“Q. How long have you seen her, how many times?
“A. I’ve seen her a couple of years.
“Q. You knew her and you knew her , name?
“A. Yes, sir.
“Q. Did you see her at any evening around the Florida Bar that you know of?
“A. Yes, she drops in there.
“Q. Do you know her husband, James Williams ? :
“A. Yes, sir.
“Q. How long have you known him?
“A. Oh, about a year and a half or better.
“Q. When you said you didn’t know him, did you know who he was ?
“A. I knew who is was, not knowing him personally.
“Q. Who was it said, ‘Gussie Mae’s old man?’
“A. Sir?
“Q. Who was it used the words, ‘Gus-sie Mae’s old man?’
“A. Levon Clark.
“Q. When you say you called Officer McPhail, what did he do?
“A. Well, he came and he stopped by the Embers and picked me up and Robert Collins, and Edward Grimes and Sarah, we stopped by the Embers and he went in and looked for Levon Clark, but Le-von wasn’t in there. He went out to the lake.
“Q. Was Robert Collins there?
“A. Robert Collins was out to the lake because we were right here. He said Cigar knocked him in the water and he crawled out and stood up. And he was holding his stomach then bending over.
“Q. Who said that?
“A. Robert Collins, Bobby.
“Q. Is that all was said ?
“A. That is all that I know of.” (TR 98 to 102, inc.)
Sarah Lee Council, a witness, stated she saw Bobby Collins and Levon Clark late Thursday night after the killing took place. She said:
“A. Well, about 12:30 on Third and Rosemary, Cigar told me that Bobby had killed a man, and Bobby said he didn’t do it. He said that Cigar had did it.
*358 “Q.. When you say Cigar, is that Levon Clark?
“A. Yes.
“Q. Where did that take place?
“A. Third and Rosemary.
“Q. What else did they say about it?
“A. They didn’t tell me anything else because I fainted.”
Subsequently, Sarah Lee Council told a varying story about this.
Edward Grimes, another witness, stated that he saw Levon and Bobby around 11 o’clock that evening and then further testified:
“Q. Did you hear Bobby Collins and Levon have any conversation about an incident that took place ?
“A. They had an argument and passed a few licks.
“Q. What did they have an argument about, if you know? If you don’t know, don’t tell us.
“A. I really don’t know.
“Q. Was Sarah Lee Council there at the time?
“A. Yes, she was.
“Q. When you say passed a few licks, who was it passed a few licks ?
“A. Cigar and Bobby.
“Q. And who stopped it?
“A. Clayton.
“Q. After they had finished fighting, what took place ?
“A. Well, Clayton and Cigar walked around the corner, he told them he didn’t know what they were fighting—
“Q. Who said that?
“A. Cigar. He said they did enough to get the electric chair.
“Q. Who said that?
“A. Cigar.
“Q. Is that Levon Clark?
“A. Yes, sir.
«* * *
“Q. Did Levon tell you that?
“A. Yes, he said that Bobby had killed Gussie’s husband.
“Q. And that is Levon that is called Cigar that told you that ?
“A. Yes, sir.
“Q. What did you do then?
“A. I was still standing there and by that time Bobby came around the corner and Clayton asked him did he do it, and he said not. He said Cigar did.
“Q. What did Clayton ask, what did he tell him when he asked him ?
“A. He said, ‘Did you kill that girl’s husband ?’
“Q. What did he say ?
“A. He said no.
“Q. What did he say who did it?
“A. He said Cigar did it.
“Q. Was Cigar there?
“A. He was standing there.
“Q. What did Cigar say?
“A. Cigar said, ‘no need to tell a lie now who did it. You can go and ask Gussie who did it.’
“Q. Was Bobby there when Levon said that?
“A. Yes.
“Q. What else was said?
“A. We started toward 12th Street and Clayton said, ‘The best way to *359 prove who did it is call the police.’ So we started towards Third Street to the police phone and we got there, Sarah walked up and asked Cigar was that true what Clayton had told, and he said yes. She fainted. So he picked her up and carried her off the street and got a towel and said he was going to wet it. When he left, the police came up.
“Q. Were you there when Clayton called the police?
“A. I was.
“Q. Now, you are sure that the conversation you have given us is the Levon Clark and Robert Collins you see here?
“A. Yes.”
Dr. Hugh Dortch, Jr., a pathologist, testified he performed an autopsy on the body of a man found on the Twelfth Street canal. The gist of his testimony was that he diagnosed drowning as the cause of death but there were various bruises and swelling around his head, a sinking in of the right cheek, the zygoma was fractured and pushed in, and the nose was bloody. His face was beaten to such an extent that it gave his head a lopsided appearance, including a fracture of the cheek bone itself. Dr. Dortch testified that these bruises and injuries were received before the man had been pushed into the water. He stated that these bruises resulted from some type of heavy blows and there were at least 13 bruises.
Dr. Dortch stated that these bruises had to be present before the man died, stating:
“A. Yes, sir. They had to be present before he died. It actually requires the force of the heart to produce the bleeding from the broken blood vessels into the tissue.
“Q. So the fact the blood tissues had been broken was evidence to you he was alive at the time he was hit?
“A. Yes, sir.
“Q. Now, what else now please, sir, on the scalp, anything else on the scalp ?
“A. No, sir. The skull itself was not damaged and the brain didn’t show any significant damage either. Despite these blows the skull had remained intact, it had not been broken. It was not possible to count the number of bruises in the vicinity of the face because it was such diffused swelling, especially in the left eye region.”
Further in the doctor’s testimony, he stated:
“A. * * * On the neck there were 18 crescent-shaped abrasions relatively short. They had the shape of, a crescent-shape of fingernail marks when a person is grasped ed around the neck. The fingernails of the hand that grasped the neck frequently leave marks of this type. However, there were 18 of them, which is more than we usually find in a simple case of strangling. They pointed in different directions. I believe they did come from fingernails contacting the skin very forcefully, but it indicates that the neck was grabbed many times rather than just one time, or perhaps by more than one pair of hands. They were also found, they were on the anterior part of the neck, which would usually be the situation if someone were grabbed from behind, the hands, the thumbs, would be behind the neck and the fingers in front, and that is the way it indicates where a person was grabbed from behind, and *360 that is the way these were situated.
“Q. Some of them appeared as if they were grabbed from behind ?
“A. Yes, sir, the majority of them.”
On cross-examination, the pathologist testified :
“Q. So in your opinion these abrasions and injuries which you have testified to, could have happened two hours prior to the actual drowning which you have testified to?
“A. Yes, sir, that is possible.
“Q. From your examination you could not determine whether or not these injuries occurred in the water, or on the canal bank, is that correct?
“A. Well, I would say that these injuries are of a type that are almost physically impossible to produce actually in the water. How- ¡ ever, they could have all occurred \ very close to the water, right on ’ the bank, yes, sir.”
Again in his testimony, the doctor stated:
“A. * * * And it is known that many people after strangling will stop breathing for a rather prolonged period of time, long enough for you to say they are dead. I mean a witness would presume that. And then they will take one deep gasp and I think that there is a possibility in this case that this man was strangled and within a few minutes after being strangled went into the water and took this deep gasp. Without water he might have died at essentially the same time, but he happened to be in the water when he gasped and therefore the technical cause of death is drowning.”
In Bass v. State, Fla.App.1965, 172 So.2d 614, 617, this court said:
“Where an accused is charged as a principal in the commission of an unlawful act under the theory of conspiracy or confederation to commit the unlawful act, it is not essential to show an express agreement or understanding between the parties made previous to or during the commission of the unlawful act. If an accused is present, aiding and abetting in the commission of the crime, and consciously shares in the commission of the act, he thereby becomes a principal. The community of unlawful purpose, that is, the conspiracy or confederation, need not be shown by positive evidence, and the Jury may infer from all the circumstances surrounding and accompanying the act that the common purpose to commit the crime existed. It is immaterial whether the confederation resulted from a premeditated agreement to commit the act, or whether it arose on the spur of the moment, for where two or more persons conspire and confederate to commit an unlawful act, each makes the other his agent, and each is responsible for the acts committed pursuant to the common purpose. 22 C.J.S. Criminal Law § 87, pp. 258-260.”
After consideration of all of the evidence, we conclude that the jury could infer from all of the proven facts that the appellant Clark individually or in concert with Robert Collins and/or Gussie Mae Williams by conspiracy or confederation unlawfully assaulted the decedent even though no express agreement or understanding was proven. From the proven facts the jury could also infer that Clark by his presence and actions aided and abetted in the unlawful assault. The fact that drowning was the final or joint cause of death does not relieve Clark of his responsibility. We, therefore, conclude that the jury had sufficient evidence before it to find Levon Clark guilty of murder in the second degree.
*361 The appellant states his second point as follows:
“Whether or not a Court has jurisdiction to grant a motion or hear a motion for new trial filed after the four day period but within the fifteen day period allowed by Statute wherein the Court fails to act or hear said motion within the fifteen day period.”
Section 920.02(3), Fla.Stat., provides in part:
“A motion for a new trial may be made within four days, or such further time as the court may allow, not to exceed fifteen days, after the rendition of the verdict or the finding of the court, sjs * »
In the order on the motions for a new trial by the defendants, Gussie Mae Williams and Levon Clark, the judge said:
“ * * * The verdicts were rendered on January 31, 1964; the motions for new trial were filed February 10th and February 12th, 1964. The statute requires that a motion for new trial be filed ‘within four days, or such further time as the Court may allow, not to exceed fifteen days, after the rendition of the verdict.’ While the motion need not be filed within the four days, if filed thereafter, but within the fifteen days, the Court must take some action thereon within the fifteen days or the motion is untimely. Such is the rule of Farrior v. State, [Fla.] 76 So.2d 148. Since the motions before the Court were not filed within four days after the rendition of the verdict, and the Court took no action thereon within fifteen days of their rendition, the motions for new trial are not timely and the Court has no jurisdiction to grant same.
“It is, thereupon, ORDERED AND ADJUDGED that the motions for new trial heretofore filed herein on behalf of the Defendants, Gussie Mae Williams and Levon Clark, not having been filed within the time allowed by law, are denied.”
It is apparent that the court did not consider these motions and denied the same because they were not timely filed. It cannot be presumed from this order, as was done in the Farrior case, that the court gave permission for the filing of the motion, since the court specifically stated that the motions were not timely filed and that the court had no jurisdiction to grant the same.
We conclude the court took the proper action in this case, although the order might have been more properly worded if it had simply stricken them instead of denying them.
In Farrior v. State, Fla.1954, 76 So.2d 148, the Supreme Court said:
“The motion for new trial in the instant case, as aforesaid, was filed on the fifth day, and apparently was brought to the attention of the court on the eighth day, after verdict. At that time the court had the right to allow it to be filed. That the court did then allow it to be filed is self-evident from the fact that the court then ruled upon the motion on the merits instead of dismissing it.
“In the case of Perry v. State, 146 Fla. 187, 200 So. 525, 526, it was not certain from the record when the verdict was rendered by the jury. Thus in that case, as in the instant case, the motion could have been properly filed, but the record made no affirmative showing to that effect. In the Perry case, as in the main case, the State contended that this Court should not review the order denying motion for a new trial because of an asserted affirmative showing that it was not timely filed. In disposing of this contention, we said ‘since the trial court denied the motion for new trial instead of dismissing it, we must presume, in the absence of a contrary shozmng by the record, that his ruling *362 was correct and the motion was filed within the time limited by statute (Italics added.)”
The motion for new trial was not filed within the statutory time and should have been stricken.
Only two questions were argued on this appeal, one involving the sufficiency of the evidence, and the other, whether or not the court was correct in denying the motion for a new trial.
Finding no error, the lower court is affirmed.
Affirmed.
SMITH, C. J., and WIGGINTON, JOHN, Associate Judge, concur.